**REIL v. McNASPY.**

No. 1770.

Court of Appeal of Louisiana. First Circuit.

Dec. 9, 1937.

Welton P. Mouton, of Lafayette, for appellant.

F. X. Mouton, of Lafayette, for appellee.

OTT, Judge.

Mrs. Reil, the plaintiff, was injured while riding as a guest in an automobile driven by the defendant, Mrs. McNaspy, on the afternoon of May 5, 1935. At the time of the injury, the two ladies were returning from New Iberia to Lafayette, and the accident occurred about 1½ miles out from New Iberia on the Old Spanish Trail paved highway. It is alleged that the defendant was driving her automobile at about 25 to 30 miles per hour along the road when a horn was sounded by a motorcycle in the rear before passing the car in which the ladies were riding; that, when this horn

was sounded by the approaching motorcycle, the defendant negligently and carelessly steered her car too precipitately to the right, and, finding herself too near the guardrail, made a sharp turn to the left, lost control of the car, and zigzagged from one side of the road to the other, negligently putting her foot on the accelerator instead of the brakes, thus causing the car to pick up speed, the car running into the guardrail on the right side of the road and throwing plaintiff out with great force and violence.

Plaintiff alleges that as a result of the accident she suffered a comminuted fracture of the left humerus just below the anatomical juncture with the shoulder joint, cuts on her chin, and various bruises and contusions over her body, particularly her chest; that two teeth on her plates were broken and her gums were cut and her mouth made sore; that her eyeglasses were also broken. She claims damages in the total sum of $5,778.

It is alleged that the cause of the accident was the gross negligence of the defendant in losing control of the car, and in pressing on the accelerator instead of applying the brakes when the motorcycle horn was sounded in the rear as a signal to pass.

Several motions and exceptions were filed, and these were either overruled, or the objections contained in them were complied with. As none of these motions and exceptions are pressed in this court, we will give them no further consideration, except it might be well to state that, in a supplemental petition, the heirs of plaintiff's deceased husband, who died after the accident, were made parties to the suit in order to recover whatever portion of the damages might be found due the community.

Defendant admits the accident and the injury of plaintiff while riding as a guest in the car, but defendant denies that the injuries suffered by plaintiff are as serious as claimed. The defendant alleged that the sole and proximate cause of the accident was the negligence of the operator of the motorcycle in suddenly blowing a loud and terrifying horn or siren just as he was about to pass her car; that, upon hearing the loud blast of said horn she was unnerved and frightened, and she naturally and instinctively turned the steering wheel to the right in order to give what she thought was a large bus room to pass, and, as she did this, the wheels on the right side of her car left the paved portion of the road, whereupon she sought to get back on the paved portion of the road and in so doing her car turned

over causing injury to plaintiff and herself; that she was not guilty of any negligence, but acted as any other reasonable person would have acted in the emergency created by the loud blast of the horn in the rear, and that the accident was inevitable.

The trial court rendered judgment in favor of plaintiff in the sum of $3,000, and in favor of plaintiff and the two heirs of her deceased husband in the further sum of $258 as that part of the damage accruing to the community. Defendant has appealed, and the plaintiffs have answered the appeal asking that the allowance of damages be increased to the amount originally claimed in the petition.

There were only four witnesses who testified as to how the accident occurred—plaintiff and defendant, and two young men who were riding a motorcycle. There is no great difference in their testimony, except in a few minor details. The defendant says that when the horn blew behind her she thought it was a large bus, and she pulled to the right to give room for it to pass; that she drove to the right and then to the left. She does not know if she stepped on the gas, but says that it is possible that she did. She says the horn was very loud, and the passing vehicle made a lot of noise.

She admits that she got onto the right shoulder and then zigzagged across the road once or twice before going into the ditch on the right.

The plaintiff's account of the occurrence is as follows: "We started to Lafayette and just out of the City limits I heard some motorcycle horn sounded at the side of Mrs. McNaspy, and she swerved her car to the right, thinking to get out of the way of the vehicle, and I suppose realizing how near the shoulder she was, she brought it back to the left and realizing she was not righting her car, with more speed, the car went across the road and back and the third time we hit the guard rail, and then the door of the car opened, and the car went over, and we both fell out."

This witness says the speed of the car was accelerated when going backwards and forwards across the road, and she did not see the defendant put her foot on the brakes. She says in her testimony that the horn which blew on the passing vehicle was not unusually loud, although in a previous written statement she said it was a loud horn that blew.

The testimony of the two young men on the motorcycle is to the effect that another

boy on a motorcycle passed defendant's car just ahead of them; that the driver of the motorcycle on which these two young men were riding blew his horn when a few feet to the rear and to the left of the car as a passing signal; that the car was traveling slightly over the center black line, and, when the horn of the motorcycle was blown, the car suddenly swerved to the right, then zigzagged across the road two or three times and went into the ditch on the right-hand side; that as soon as the car began swerving from one side of the road to the other, the driver of the motorcycle pulled over on the left shoulder to avoid the zigzagging car, and the rear tire on the motorcycle blew out as the vehicle crossed a rut; that the motorcycle was pulled back on the road, and proceeded two or three hundred feet further where it came to a stop. Both of these boys deny that the horn on the motorcycle was unusually loud, or that the machine made any unusually loud noise.

It is generally known that motorcycles usually make quite a lot of noise in running, and their speed and approach in passing a car on the highway is different from the passing of another car. But a person driving an automobile on the through paved highways of the state should be prepared for the approach of these various kinds of vehicles that may be expected to pass at any time. The law requires that the driver of an overtaking vehicle shall give audible and sufficient warning of his intentions before overtaking, passing, or attempting to pass a vehicle proceeding in the same direction. And when the driver of the vehicle in front has been given this warning that the vehicle in the rear intends to pass, it is the duty of the driver of the vehicle in front to give way to his right in favor of such overtaking vehicle, and not to increase the speed of his vehicle until the overtaking vehicle has passed. Rule 7(b) and (f), section 3, Act No. 21 of 1932.

The defendant says that she thought the horn was that of a large bus about to pass her. Every driver on the highways knows, or should know, that many large busses frequently pass automobiles on the through highways of the state. There was no reason for defendant to become excited or frightened at the sound of the horn and approaching vehicle to the extent that she would lose control of her car and zigzag across the road and speed up her car instead of slowing it down. Admitting that the horn was loud and that considerable noise was made by the approaching motorcycle, defendant should have been prepared for such a situation. She was driving at a slow rate of speed and knew that other vehicles would be passing her constantly from the rear. She owed the duty to her guest of keeping her car under control. Monkhouse v. Johns (La.App.) 142 So. 347. We think the trial judge correctly held the defendant liable for the injuries sustained by plaintiff in the accident.

The trial judge awarded plaintiff $1,800 for pain and suffering and shock, and the sum of $1,200 for disability and loss of earnings. He awarded plaintiff and the two heirs $258 for expenses to the community on account of the injury. Counsel for plaintiffs contends that these awards are too small, while counsel for defendant complains that they are too large.

The most serious and the only permanent injury suffered by plaintiff was the comminuted fracture of the humerus of the left arm. She was in the hospital for about four days, and was confined to her bed at home for some six weeks. She suffered considerable pain from the time of the injury until some six weeks later, it being necessary to give her opiates frequently to ease the pain and induce sleep. The physician who treated her injuries during this period states that she suffered considerable pain, and the injury has caused traumatic neuritis in this left arm, which is likely to continue indefinitely. Plaintiff is not a very strong woman, and it appears from the testimony of her doctor that she has become more nervous since the shock from the injury and consequent pain. We think an award of $1,500 for physical pain and suffering and mental and nervous shock would be about in line with the awards for similar injuries.

It is shown that plaintiff made fruit cakes for sale and knitted for the public before her injury in order to help make a living. She estimates her earnings for this work at $100 to $150 per year. She can no longer do this kind of work. She was offered a position as housekeeper for Msgr. Teurling, pastor of St. Genevieve's Church, at $25 per month and board, lodging, and laundry, but after trying this position for three weeks in January, 1936, she was compelled to give it up on account of her arm and physical condition. Her doctor fixed her disability for the first six months after the injury as total, and from 50 to 60 per

cent. for the next six or eight months. He estimates the permanent disability of the arm at from 25 to 30 per cent.

One doctor who was called by defendant testified that, when he examined her in March, 1936, ten months after the accident, there was from 50 to 60 per cent. disability in the use of plaintiff's left arm and shoulder, but with proper use this disability should be reduced to 15 or 25 per cent. Another doctor called by defendant estimated plaintiff's permanent disability at 25 per cent.

Counsel for defendant contends that the prospective earnings of plaintiff are too uncertain and speculative to support an award for their loss. But all prospective earnings are in a measure speculative, because there are always contingencies that no one can foresee nor determine in advance. We think plaintiff has made it reasonably certain that she would have earned something from her knitting, and, as the housekeeper for Father Teurling, she could have earned $25 per month and her board and lodging for an indefinite time. We think the award of $1,200 for the disability is justified, and we see no reason to change it.

Nor do we see any reason to change the award made to plaintiff and the heirs of her deceased husband for expenses occasioned the community by the injury. The doctor bill of $77.50 and the hospital bill of $80.50 are both proved. The expense for the repair of plaintiff's plate and glasses amounting to $10 is admitted. The claim for $90 for nurse during the six weeks plaintiff was in bed should be allowed. Plaintiff had to be bathed, dressed, and carried to the bathroom. This service is certainly worth $15 per week, and it is immaterial that the nurse was not to claim the amount unless plaintiff recovered in this suit for the reason that plaintiff would not otherwise be able to pay it. This makes a total of $258. The value of the clothing torn off of plaintiff when she was taken to the hospital is not shown, and the trial judge correctly disallowed that item.

In fixing the damages in this case, we have read and carefully considered the following cases where somewhat similar injuries were sustained: Price v. Tarver et al. (La.App.) 148 So. 450; Chapman v. Moore, 19 La.App. 566, 141 So. 431, and Weinfield v. Yellow Cab Co. Inc., 10 La.App. 313, 120 So. 420. But no two cases ever present exactly similar injuries, and consequently each case must depend to a large extent on its own peculiar facts. Other cases can only serve as a guide.

For the reasons assigned, the judgment appealed from is hereby amended by reducing the amount of the awards from a total of $3,258 to the sum of $2,958, and, as thus amended, the judgment is affirmed; plaintiff-appellee to pay the cost of the appeal, and defendant-appellant to pay all other costs.